## Case No. 15,329.

### UNITED STATES v. HAUN.

[8 Am. Law Reg. 663.]

Circuit Court, S. D. Alabama. June 30, 1860.

AFRICAN SLAVE TRADE—LAWS FOR SUPPRESSION —WHO INDICTABLE.

1. An indictment under the sixth section of the act of congress of April 20, 1818 [3 Stat. 452], for the suppression of the African slave trade, can be sustained against one who holds, sells, or disposes of an African illegally brought into the country from any foreign kingdom, place, or country, or from sea, no less than against any person who shall illegally bring such African into the country.

2. The word "or" in this statute is not to be construed "and."

3. Property in persons entering the United States with their own consent, and mingling with property and persons in the States, in some manner and to some extent fall under state authority, and in some manner and to some extent are not subject to federal control; but the case is otherwise with regard to property imported contrary to law, or smuggled, or persons imported against their will.

4. Some account of the federal slave laws, and their history.

[This was an indictment against John H. Haun.]

CAMPBELL, Circuit Justice. This indictment contains three counts, and charges that the defendant held, sold and disposed of, in this district, negroes, as slaves, illegally imported into the United States in 1859, from a foreign place, by some person unknown. The district attorney, in moving

for process for the arrest of the defendant, suggested that the opinion had been expressed upon a similar indictment in this court, by my colleague, the judge of the district court, that the offence charged did not subject the defendant to a criminal prosecution, and that if that opinion was concurred in by the presiding judge, process ought not to issue. My colleague of the district court was of counsel for this defendant before his appointment to the bench, and does not sit in this case. I have considered the subject with care, and shall proceed to express my opinion at large, in consequence of the importance of the subject and the condition of opinion in this tribunal.

The indictment must be supported under the sixth section of the act of April 20, 1818, for the suppression of the African slave trade. The section is: "If any person or persons whatsoever shall, from and after the passage of this act, bring within the jurisdiction of the United States, in any manner whatsoever, from any foreign kingdom, place, or country, or from sea, or shall hold, sell, or otherwise dispose of any such negro, mulatto, or person of color so brought in, as a slave, or to be held to service or labor, or be in anywise aiding or abetting therein, every person so offending shall, on conviction thereof by due course of law, forfeit and pay a sum not exceeding ten thousand dollars, nor less than one thousand dollars, one moiety to the use of the United States and the other to the person or persons who shall sue for such forfeiture and prosecute the same to effect; and, moreover, shall suffer imprisonment for a term not exceeding seven years, nor less than three years." The object of this section of the act was to prevent the introduction of persons who, for the purpose of this discussion I will denominate Africans, and their employment, sale, or other disposition as slaves within the United States. This introduction or use is made penal, however, or by whomsoever made. By the language of the section, the act of importation and the acts of holding, selling, or disposing of the African, the subject of importation, are distinct offences. It is, "if any person," "shall bring," "in any manner" from abroad, "or shall hold, sell, or dispose of any negro so brought in" as a slave. Neither is it necessary that the offenders under the one clause shall be in any relation of accessories or accomplices under the other clauses of the act. "Every person aiding or abetting" in either of the criminal acts, is denounced as criminal in the degree of his principal, by its plain language. The manifest import of this section of the act is, that if any person shall import an African, as a slave, into the United States from abroad, (i. e. foreign kingdom, place, or country, or by sea,) or be in anywise concerned therewith, or shall hold, sell, or otherwise dispose of as a slave, an African, being illegally import-

ed. he shall suffer the penalties prescribed. Now, upon this construction of this section of the act there is charged against this defendant acts that are criminal, and which subject him properly to a presentment of the grand jury. But it is said that the act must be limited to such as were concerned with the importation, and that a proprietor by purchase ex post facto, is not embraced within the terms of this section of the act. An analysis of the section shows that "if any person or persons whatsoever" "shall bring within the jurisdiction of the United States" any African as a slave, "or be in anywise aiding or abetting therein," "or shall hold, sell, or dispose of such African as a slave, or be in anywise aiding or abetting therein, every person so offending shall forfeit and pay," &c. To justify the argument relied on, the word "and" should be substituted for the word "or," and the act should read, "If any person shall bring within the jurisdiction of the United States, 'and' shall hold, sell, or dispose of any African as a slave." But the exigency must be imperious which will justify this court to take such a license with an act of congress as to substitute the one word for the other.

This section was reported in the form in which it stands (in so far as this question is concerned) from a committee of the senate, was considered by both houses of congress, and amended in other particulars, and became the law of the land by the concurrence of congress and the president. The intention of congress must be very clearly contrary to the language of the act to authorize so important a change in the signification of the words employed. But a change of the word "or" to "and" would leave the importer and his accessories guiltless, unless there was some holding or other act of dominion subsequently. A sale of the cargo, before the importation accompanied by delivery, without more afterward, would be unprovided for in this section of the act. But the whole series of the slave trade acts show that the simple act of importation was regarded by congress as a high misdemeanor. The fifth section declares that neither the importers nor any person claiming from or under them, shall hold any right, interest, or title whatsoever in, or to any negro, mulatto or person of color, nor to the service or labor thereof, who may be imported or brought into the United States in violation of the provisions of this act. The sixth section, previously quoted, provides for the punishment of the importer,—he who brings within the jurisdiction of the United States the African,—and for the punishment of those who hold any right or title under him; that is, those who hold, sell, or otherwise dispose of the African imported. This section is the vindicatory complement of the fifth section. The importer and those who hold,

sell, or otherwise dispose of the African, and their accomplices, comprise all who contribute to foster or encourage the prohibited traffic. And this conclusion is corroborated by the eighth section of the act. This is, that "in all prosecutions under this act the defendant shall be holden to prove that the negro, mulatto, or person of color, which he shall be charged with having brought into the United States, or with purchasing, holding, selling, or otherwise disposing of, and which according to the evidence in such case, the said defendant shall have brought in aforesaid, was brought into the United States at least five years previous to the commencement of this prosecution, or was not brought in, holden, purchased, or otherwise disposed of contrary to the provisions of this act." Congress, by this section, imposes upon all persons the obligation to make a diligent inquiry into the integrity of every right or interest, asserted or exercised over the person of an African before acquiring it. They evidently infer that but few, if any, derivative claims to Africans. illegally imported, would be bona fide, and that every holder, vendor, or employer of such persons, would be conscious of the infirmity of their estate, and therefore of their criminality under the laws of the United States. The slave trade at the date of the act of 1818 had been prohibited ten years.

It was a rational hypothesis, that those Africans, who were then in the United States, might be easily discriminated from those who might be imported illegally afterwards. The African is a rational being, and may communicate to an interested inquirer the conditions under which he came from his native continent. If this was not an unreasonable hypothesis in 1818, it is an assured fact now. The African, legally imported prior to 1818, and residing in the United States since that date, must be readily distinguished from the African imported in 1859. The importer, or the most casual inquirer, must be able to say of the latter class, "Surely thou art one of them; for thy speech betrayeth thee." Before leaving this part of the inquiry, I will examine the seventh section of this act, as it is intimately connected with this subject. This section is: "If any person or persons whatsoever shall hold, purchase, sell, or otherwise dispose of any negro, mulatto, or person of color, for a slave, or to be held to service or labor, who shall have been imported or brought, in any way, from any foreign kingdom, place or country, or from the dominions of any foreign state immediately adjoining to the United States, into any port or place within the jurisdiction of the United States, every person so offending, and every person aiding or abetting therein, shall severally forfeit and pay for every negro, mulatto, or person of color so held, purchased, sold or disposed of, one thousand dollars, one moiety to the Unit-

ed States, and the other to the person or persons who may sue for such forfeiture and prosecute the same tc effect, and to stand committed until the same is paid." It is assumed that all persons holding. purchasing, selling or disposing of an imported African, as a slave. without reference to the place whence imported, is comprehended in this section, and that its operation is not limited to Africans imported from territories adjoining the United States. For the purpose of this discussion, I shall concede this. It will be perceived, then, that the words employed in this section embrace a portion of the same acts that are included in the sixth section, and that other offences are embraced, which makes the seventh section a complement of the sixth section—the two sections embracing every case of title derived from an illegal importation. The sixth section provides for the punishment of an importer from a foreign kingdom, place, or country, and from sea, and the seventh adds the dominions of a foreign state adjacent to the United States. The two sections embrace the same offence of holding. selling, or disposing of slaves. The penalties are dissimilar. and the mode of their recovery is different. The penalties of the sixth section can attach only after the presentment of a grand jury; those of the seventh may be recovered in an action of debt. The questions arise upon the view of the act I have been taking. whether the penalties are cumulative or alternative. or must we find some distinct subject upon which each shall have a distinct operation, and is this distinct subject to be attained by changing a word in the act of congress for one of a different meaning? It is not important to settle whether the penalties are cumulative or alternative. The latter inquiries are the only ones of importance in this case. I have before stated there is no ambiguity in the language of the act. The doubt, if one exists, originates in the uncommon fact that there are apparently distinct penalties. differing in degree and mode of prosecution, for the same offence. That double penalties will not be inferred from equivocal words, is admitted, and that the rules of interpretation discourage implications favorable to them.

But this rule is subordinate to that primary rule that directs us to find in the plain language of the legislature their purpose. Now. the act under consideration. and statutes of a similar nature, furnish instances of congressional legislation. in which double. cumulative and alternative penalties are inflicted against the same person for the same act. U. S. v Sixty-Seven Packages. 17 How. [58 U. S.] 85. The several sections of this act exhibit a forfeiture of the ship built and equipped for, or employed in. the slave trade. and the owners. builders. and persons manning. or loading. or interested in the importation. are punished with fine and imprisonment. These various penalties may, in supposable cases, all overtake the same offender. This proves that congress were aware of the difficulty of detecting and convicting the persons engaged in this trade. and have sedulously and ingeniously legislated to enlist the cupidity of detectives and informers to aid the moral sense and public spirit of the country to bring them to justice. But if the seventh section were construed as applying only to importations from states or dominions adjacent to the United States, and the sixth section to places more remote, there would be a distinct field for the operation of the sixth and seventh sections, and there would be no question concerning double penalties. I leave that part of the act open until a case shall arise for judgment. The circumstances accompanying the enactment of the act of 1818 may be considered in ascertaining the policy of congress on the subject. Congress were informed that the slave trade was vigorously prosecuted by citizens of the United States. and particularly through the Spanish settlements of Florida and Texas, and that Africans, to the number of thousands, had been illegally imported into the United States. The correspondence of the collector of the port of New Orleans (Mr. Chew) with the treasury department was placed before congress. in which the names of planters, probably connected with the importation of slaves, may be found. Mr. Forsyth, of Georgia, in a report from the committee on foreign relations, informed congress: "The experience of ten years has evinced the necessity of some new regulations being adopted in order effectually to put a stop to the further introduction of slaves into the United States. In the act of congress prohibiting this importation. the policy of giving the whole forfeiture of vessel and goods to the United States, and no part thereof to the informer. may justly be doubted. This is an oversight which should be remedied. The act does, indeed, give a part of the personal penalties to the informer. but these penalties are generally only nominal, as the persons engaged in such traffic are usually poor. The omission of the states to pass acts to meet the act of congress, can only be remedied by congress legislating directly upon the subject themselves. as it is clearly within the scope of their constitutional power so to do." Congress. thus counselled. employed committees. who carefully revised the act of 1807 [2 Stat. 426] for the same object, amplified its scope. and increased its penal provisions. and their bill was. after proper deliberation and some amendment. adopted. and forms the act of April 20, 1818.

When I consider the mischief to be removed. the variety of sentiment to be addressed to secure co-operation for that object, the subtle artifices employed to evade the laws.

and the difficulty experienced in their enforcement, I am not able to say that the variety of the penalties and of the modes of pursuit and prosecution creates surprise. It is evident that congress did not discover any great difference in the misdemeanor of the different persons who might be concerned in the importation or holding of Africans illegally introduced into the country, and considering this opinion, the design they wished to accomplish, and the embarrassments in the way of its accomplishment, I find myself quite unable to discover that incompatibility in their enactments and sound principles of legislation, that should lead me to do violence to their language to set them aright. Regarding the language of the act of 1818 alone, my opinion is, that the indictment charges an indictable offence against the defendant.

But another rule is invoked which is entitled to consideration. It is said that the power of congress is limited to a cognizance of the acts of the importer, and those concerned with him. That Africans, whether considered as persons or as property, after they come within the jurisdiction and limits of a state, cease to be under the dominion of the federal authority. They are no longer subject to the commercial power of congress which alone applies to the subject, and the crime of holding them as slaves is a state, not a federal crime. The cases of Brown v. Maryland, 12 Wheat. [25 U. S.] 438; Norris v. City of Boston, 7 How. [48 U. S.] 283, and the popular opinion and judgment on the alien law of 1798, are supposed to confirm this opinion. It may be admitted that property or persons introduced or entering the United States by their consent; and mingling with property and persons in the states, in some manner and to some extent, fall under state authority, and in some manner and to some extent, are not subject to federal control. The decision of Brown v. Maryland was a case of property legally introduced through the customhouse of the United States. The supreme court of the United States held that it was not subject to state taxation until it had ceased to exist as in the condition of an import, and had not become confused or mingled with the common property of the state. The case of Norris v. City of Boston recognized a similar limitation on state authority as to persons, and that passengers on a foreign ship could not be taxed by state authority until they were fairly separated from the ship and voyage. But these cases only prove when state authority may begin to operate, and not when the federal authority terminates, upon property or persons legally introduced into the country. But suppose the case of merchandise imported contrary to law, or smuggled, would it be contended that the federal authority was at an end when the property became mingled with the property of the state, and had gone into the

hands of bona fide purchasers? This is not an open question. In U. S. v. 1,960 Bags of Coffee, 8 Cranch [12 U. S.] 398, the claimants alleged, and the demurrer of the United States admitted, that the coffee was regularly entered and the duties secured, and that they were bona fide purchasers of it for value. The supreme court said: "We are of opinion that the question rests altogether on the wording of the act of congress, by which it is expressly declared that the forfeiture shall take place upon the commission of the offence." If the phraseology were such as in the opinion of a majority of the court to admit of doubt, it would then be proper to resort to analogy, and the doctrine of forfeiture at common law, to assist the mind in coming to a conclusion. The court declare the power of congress over the subject in the following impressive language: "In the eternal struggle between the avarice, enterprise and combinations of individuals on the one hand, and the power charged with the administration of laws on the other, severe laws are rendered necessary to enable the executive to carry into effect the measures of policy adopted by the legislature. To them belongs the right to decide on what event a divesture of right shall take place, whether on the commission of the offence, the seizure, or the condemnation." Other cases of a similar nature have arisen, in which acts of congress have been interpreted as establishing the one or the other period when the forfeiture attached, and in no case has the authority of congress to legislate been disputed. U. S. v. Grundy, 3 Cranch [7 U. S.] 337; U. S. v. Caldwell, 8 How. [49 U. S.] 367. The power of congress to provide for the seizure and removal of persons coming to the country illegally and without their consent, has been asserted as fully in judicial decisions as it has been in regard to property.

The most signal instance of this arises under the extradition laws and treaties requiring the surrender of a fugitive from the justice of foreign nations. Metzer's Case, 5 How. [46 U. S.] 176; In re Kaine, 14 How. [55 U. S.] 103. In Holmes v. Jennison, 14 Pet. [39 U. S.] 540–570, the chief justice says: "All the powers which relate to our foreign intercourse are confided to the federal government. Congress have the power to regulate commerce; to define and punish piracies and felonies committed on the high seas, and offences against the law of nations; to declare war; to grant letters of marque and reprisal; to raise and support armies; to provide and maintain a navy; and the president is not only authorized, by and with the consent of the senate, to make treaties, but he also nominates, and by and with the consent of the senate, appoints ambassadors and other public ministers, through whose agency negotiations are to be made and treaties concluded. He also receives ambassadors sent from foreign countries;

and everything that concerns our foreign relations. that may be used to preserve peace or wage war, has been committed to the hands of the federal government. The power of deciding whether a fugitive from a foreign nation should or should not be surrendered, was necessarily a part of the powers granted." It would seem to follow irresistibly. that if congress might provide for the arrest and removal of foreigners who had evaded the justice of a foreign nation, by flight to the United States, notwithstanding his domicil within any of the states. they might provide for the removal of those who had been imported, or had entered the United States contrary to their own laws, and that state authority could afford such a person a sanctuary or shelter. Nor do I perceive any contradiction of this conclusion in any of the opinions in the Passenger Cases, nor is it opposed to the opinion of any accredited tribunal, political or judicial, on the alien law of 1798 [1 Stat. 570]. The complaint against the alien law was, that it authorized the president to remove from the country a foreigner legally domiciled in the United States, and belonging to a nation with which the United States were at peace. upon an opinion that he was dangerous to the government, without an accusation under oath. or affording him the opportunity of making a defence. The case before the court is one in which the power of congress to pass laws to prohibit the importation of Africans. or slaves, cannot be denied. The subject entered into the debates of the continental congress. and forms one of the compromises on which the constitution rests. Under the constitution the "migration or importation of such persons as any of the states now existing shall think proper to admit, shall not be prohibited prior to the year 1808." On the first day of the year 1808, by an act of congress made to meet the approach of their plenary authority. the importation of Africans as slaves, or the purchasing of them from the importer, became illegal. In 1814 [8 Stat. 218]. in the treaty of peace negotiated at Ghent with Great Britain, the trade was declared to be "contrary to humanity and justice," and an obligation was then entered into to discourage it. The act of 1818 was subsequently passed, and the more severe act of May, 1820, completed their penal legislation on the subject. No system of measures exists in our legislation that has been more carefully considered, or which obtained more completely the deliberate, impartial and conscientious approbation of states and statesmen. It requires no small measure of moral and intellectual intrepidity to impugn them. A few have expressed the opinion that the power of congress was derived only from their control over foreign commerce. But in the early debates in congress this was denied. and it was said "that a reference to the constitution would ex-

pose the fallacy." Among the powers delegated by that instrument to congress, was the power to define and punish offences against the law of nations. It was afterwards added that the migration or importation of such persons as any of the states now existing shall think proper to admit, shall not be prohibited prior to 1808, but a tax or duty may be imposed on such importation. not exceeding ten dollars for each person. Before 1808 this last provision would expire, and the first provision would be reinstated in full efficacy, which unquestionably gave congress a full power over the subject. independently of that derived from their right to regulate commerce.

Unquestionably, President Jefferson, when he congratulated congress at the approach of the period at which they might interpose their authority constitutionally to withdraw the citizens of the United States from all further violations of human rights which have been so long continued on the unoffending inhabitants of Africa, and which the morality, the reputation and the best interests of our country, have been long eager to proscribe, supposed that something beyond a regulation of commerce was concerned in the action to be taken. President Madison in accepting. and the senate of the United States in unanimously ratifying, the treaty of Ghent, before mentioned, probably agreed with the argument I have quoted. The act of May, 1820, declaring the slave trade by American citizens to be piracy, and the treaty of Washington of 1842, in which the United States agreed with Great Britain to unite in all becoming representations and remonstrances with any and all powers within whose dominions such markets (markets for Africans) are allowed to exist, and that they will urge upon all such powers the propriety and duty of closing such markets effectually, at once and forever evidently imply that the suppression of the slave trade has become a part of the domain of international law. and belongs to the jurisdiction of congress as a part of that foreign intercourse of the Union which is submitted to its exclusive control. I do not consider this question of any importance in the solution of the present inquiry. for, considered merely as a commerce that the congress may suppress or prevent, they are clothed with powers adequate to the accomplishment of their policy. They are not dependent upon the state governments for ancillary legislation. nor can they be obstructed by their inaction or opposition. "No trace," say the supreme court of the United States, "no trace is to be found in the constitution of an intention to create a dependence of the government of the Union on those of the States. for the execution of the great powers assigned to it. Its means are adequate to its ends; and on those means alone was it expected to rely for the accomplishment of its ends. To impose on it the necessity of resorting to means which it cannot con-

trol, which another government may furnish or withhold, would render its course pernicious, the result of its measures uncertain, and create dependence on other governments, which might disappoint its most important designs, and is incompatible with the language of the constitution." [McCulloch v. Maryland] 4 Wheat. [17 U. S.] 316, 424. No more striking illustration of the force and accuracy of this opinion of the supreme court can be adduced than might be afforded by the concession that the power of congress over the slave trade terminates after the introduction and sale of the Africans in the states. The slave trade might be as a matter of fact reopened, by the neglect or refusal of a state to enact or enforce prohibitory laws; for it can hardly be supposed that every port and inlet of the United States will always be properly guarded, so as to prevent their introduction and sale.

The expectations of the states which framed the constitution, and stipulated that after 1808 congress might abolish the trade at once and forever: the solemn treaties, binding the nation to employ moral and material force to effect throughout the world the closing of slave markets for Africans forever: the acts of congress prohibiting the trade, and confiscating the implements and machines employed in it, as if they were accomplices in the guilt—acts passed with unanimity, and sanctioned by an approving people, might be frustrated and defeated if the African could be held, sold, or otherwise disposed of, without responsibility to those in whom the constitution has conferred the power of making these laws and treaties. No such consequences can follow. The constitution has not left the power of the federal government to employ the means requisite to fulfil its obligations, and to execute its authority to cavil or question. It confers upon congress the power "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by the constitution in the government of the United States, or in any department or officer thereof." The power to inflict punishment for the infraction of laws is incidental to the power of making laws. This is the usual as it is the appropriate means, by which a government secures obedience, and upon this foundation the criminal jurisdiction of the United States reposes. Before the enactments under consideration had been made, philosophic and practical statesmen had discovered "that the true origin of the slave trade was not in the place it was begun at, but at the place of its final destination." If there were not men who held, sold, or otherwise disposed of Africans, after the termination of the slave voyage, and the act of importation completed, there would be no building, equipping and manning of ships, no voyages to the African coast for slaves, no barracoons to supply American vessels, no piratical seizures, no confinements or detentions of Africans as slaves, no mortuary lists of the victims of such acts to startle and shock humanity, no need of African squadrons, or slave trade treaties, no illegal entries or importations. A complete preventive of the holding, selling or disposing of Africans within the limits of the United States, or by the citizens thereof, would remove the stain which has fallen upon our country by the abuse of its flag. This legislation of congress, then strikes at the root of this evil. If enforced it would extirpate a large share of the mischief. Such being the case, I am unable to bring myself to the conclusion that the means congress have selected by imposing penalties upon an offender against their laws are not necessary and proper to the end. I cannot assent to the conclusion, that they cannot execute their obligations to suppress a trade which they have declared to be contrary to humanity and justice, by punishing the citizens who hold and dispose of the subjects of that trade anywhere within their jurisdiction.

After the act of 1807 had been passed, an apprehension was expressed, that the eighth section of that act applied as well to domestic slaves as to slaves imported contrary to law; a committee was raised to inquire of the subject, and Mr. John Randolph, of Virginia, reported an explanatory bill. It is, that "Whereas doubts have arisen, or may arise, touching the construction of the eighth section of the act of which this is explanatory, and whereas, congress disclaim and disavow all constitutional authority whatsoever, by any legislative act, in anywise to abridge, modify, or affect the right of property of masters of slaves not imported into the United States contrary to law, in and to such slaves; be it enacted," &c. &c. The bill proceeds to declare that the act of 1807 shall be construed according to the principle announced in the preamble, and that no fine or penalty or forfeiture should be incurred in reference to any act prohibited in the eighth section, except in respect to slaves imported contrary to law. This report seems to draw the line between federal and state jurisdictions with exactness. The power of congress to enforce their laws in respect to slaves imported contrary to their policy, and in violation of their enactments was not disputed, while the authority to interfere with domestic slavery, legally existing in the states, was disavowed and disclaimed in this report. And it cannot be doubted that this was the sense of congress, although it adjourned without acting upon this bill. I have declared that the offence created by the sixth section of the act is an indictable offence. The sixth section provides that on conviction, by due course of law, the offender shall forfeit and pay for every such offence a sum not exceeding ten thousand dollars, nor less than one thousand dollars: and moreover shall suffer imprisonment for a term not ex-

ceeding seven years, nor less than three years. Within the limits assigned, it is clear that the court would determine the fine and imprisonment, and if there were nothing more in the act, that an indictment would be a proper mode of prosecution. But the same section contains a clause that distributes "one moiety of the fine to the use of the United States, and the other moiety to the use of the person or persons who shall sue for such forfeiture and prosecute the same to effect." But the mode of suit or prosecution is not explicity declared, nor is any limitation imposed upon the United States to proceed by action of debt or case, or by information. Nor is the interposition of an informer indispensable to the prosecution. The United States may proceed on the information of its own functionaries. The punishment attached to a conviction for this offence places it in the grade of offences for the robbery of the mail, when the life of the courier is not threatened, and stealing of the mail, of the offences of being accessories after the fact to murder, and piracy on the high seas, and the embezzlement of public property and misprision of felony. The constitutional, safe, regular and usual method of a proceeding against such offenders is by indictment or presentment of a grand jury, and I should require words of explicit direction, before I should feel authorized in saying that congress had prescribed a different method. The distribution of the penalty follows the conviction, and can be as well done after a criminal prosecution as a civil action. It would be a strange anomaly in the course of procedure in the courts of the United States that would terminate in a judgment of fine and imprisonment upon an action of debt or case. I think I am hardly justified by any rule for the judicial interpretation of statutes in pronouncing that the terms employed in this section of the act were designed to make so grave an alteration in the law of criminal procedure. The rights and interests of the accused are promoted by adhering to that system which is preferred by the constitution, and has been consecrated by usage.

I have thus exhibited my views upon this statute and upon the considerations that have been opposed to them. I have stated upon different occasions here, and in other courts of this circuit, the opinions that are here examined. The indictments returned in this and other cases in this court, and in other courts of this circuit, were found by the grand jury in accordance with them. Regarding this act as within the competency of congress, my duty is performed, when I have ascertained their meaning, and declare it, whenever a question is raised in a case at law upon it. This I have done in this case. The order of the court is, that process issue to the marshals of the state of Mississippi, as well as to the marshal of this district, for the arrest of the accused.